Milwaukee & Suburban Transport Corporation v. Commissioner.
Milwaukee & Suburban Transport Corp. v. Commissioner
Docket Nos. 61395, 72017.
United States Tax Court
T.C. Memo 1959-216; 1959 Tax Ct. Memo LEXIS 31; 18 T.C.M. (CCH) 1039; T.C.M. (RIA) 59216; November 18, 1959
*31 1. Petitioner paid certain amounts as dividends on its preferred stock, issued in connection with its purchase of the mass public passenger transportation system in the City of Milwaukee from a corporation which was compelled to divest itself of the same in order to comply with the provisions of the Public Utility Holding Company Act of 1935. Held: Said dividends are not deductible as "interest on indebtedness," within the meaning of section 23(b) of the 1939 Code and section 163(a) of the 1954 Code, inasmuch as the preferred stock represented an equity investment and not a debt. 2. Petitioner kept its books of account on an accrual basis. At the end of each of its first two taxable years, 1953 and 1954, it estimated its liability for potential and unsettled property damage and personal injury claims, arising out of accidents in which its employees and equipment were involved. And although it denied any liability to the injured parties, it accrued on its books of account as a liability, and charged to expense, the amount of such estimates; and it deducted the same on its Federal income tax returns. Held: The amounts of such estimated expenses were not accruable and also not deductible *32 for tax purposes, for the reasons that, as of the close of each taxable year, (1) petitioner's liability for said potential and unsettled claims was not definitely fixed; and (2) the amount of any liability which it might have could not be ascertained with reasonable certainty. Richard R. Teschner, Esq., 411 East Mason Street, Milwaukee, Wis., Dale L. Sorden, Esq., J. Roy Browning, Esq., W. W. Browning, Esq., and Robert Thorsen, Esq., for the petitioner. Thomas J. Donnelly, Jr., Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined deficiencies in the petitioner's income taxes in the amounts of $209,233.75 and $110,094.67 for the taxable years 1953 and 1954, respectively. The two cases were consolidated for trial. The issues presented for decision are: (1) Whether certain amounts which petitioner paid as "dividends" on securities designated as preferred stock were, in substance and reality, "interest on indebtedness," so as to be deductible from gross income under section 23(b) of the 1939 Code and section 163(a) of the 1954 Code. Incidental to this issue are the further questions of whether petitioner is entitled to deduct *33 in each of the taxable years, a pro rata portion of the expense of issuing said securities; and whether it also is entitled to deduct for the first of said years, a net operating loss carryover deduction from the prior year, which was based on deductions for said expense of issuing the securities, and for claimed "interest" thereon. (2) Whether petitioner properly accrued on its books of account and deducted on its Federal income tax return for each of the taxable years, its estimated amount of liabilities for personal injury and property damages alleged to have been sustained in accidents in which petitioner's employees were involved, where the claims for such damages were unsettled and contested at the close of each of the taxable years. Some of the facts were stipulated. The stipulation of facts, together with the exhibits attached thereto and identified therein, is incorporated herein by reference. I. Issue re Interest Deduction Findings of Fact Petitioner is a corporation organized on October 7, 1952, under the laws of the State of Wisconsin. It filed its returns for the taxable years 1953 and 1954 with the director of internal revenue for the district of Wisconsin. It kept its *34 books of account and filed its Federal income tax returns in accordance with an accrual method of accounting and on the basis of calendar years. Petitioner was originally incorporated under the name of Harbor Transportation Corporation. Shortly thereafter, it changed its name to Milwaukee & Suburban Transport Corporation, which it has since continued to use. At the time of its organization, petitioner's total capital was $1,000, represented by 10 shares of common capital stock of the par value of $100 per share. In the year 1952, and for several years prior thereto, the public passenger transportation system in the City of Milwaukee and its environs was owned and operated by the Milwaukee Electric Railway and Transport Company (hereinafter called the Transport Company) which was a wholly-owned subsidiary of the Wisconsin Electric Power Company (hereinafter called the Power Company). Both the parent and the subsidiary were Wisconsin corporations; and the parent also was a registered public utility holding company, subject to the provisions of the Federal Public Utility Holding Company Act of 1935 (Title 15 U.S.C., section 79). During the 1940's, the management of the Power Company and *35 of the Transport Company came to realize that by reason of the provisions of the Public Utility Holding Company Act of 1935, it would be necessary to remove the public passenger transportation properties owned by the subsidiary Transport Company, from the holding company system of the parent Power Company. Looking to that end, the management of the two companies undertook extended efforts to find a purchaser for said properties. In 1947, a prospectus offering the properties for sale was issued and widely distributed; but no bids were received. Between 1947 and 1952, negotiations were had with approximately 10 different groups of possible purchasers, including the City of Milwaukee; but the only firm offer received was that of a group made up of four individuals who ultimately became the incorporators and common stockholders of the petitioner corporation. The negotiations between the above-mentioned group and the Transport Company began in the summer of 1950; and by the summer of 1952, general agreement between the parties had been reached on the terms of the proposed sale of the Transport Company's transportation properties. The purchase price finally agreed upon was $10,000,000, payable *36 in the following manner: $4,000,000 in cash, to be raised by a purchasing corporation to be organized (i.e., the petitioner) which would float bonds to outside parties, secured by a first mortgage on the assets to be purchased; $3,000,000 of the purchasing corporation's promissory notes, which were to be issued to the Transport Company, and which were to be secured by a second mortgage on such assets; and $3,000,000 in preferred stock to be issued to the Transport Company. Also, the four individuals were to invest an aggregate of $500,000 cash in common stock of the corporation to be formed, in order to supply working capital. In adopting such plan, it was the belief of the parties that, if the issuance of the securities by the purchasing corporation was to receive the required approval of the Public Service Commission of Wisconsin (hereinafter called the P.S.C.), the ratio of corporate debt to equity capital could not be too high. Also it was believed that, if the sale was to receive the required approval of the United States Securities and Exchange Commission (hereinafter called the S.E.C.) as a divestiture by the Power Company of the public passenger transportation properties, the *37 preferred stock would have to contain redemption provisions - so that any retention of an ownership interest would be of a temporary rather than a permanent nature. Petitioner, as above stated, was organized on October 7, 1952, for the purpose of purchasing the Transport Company's passenger transportation properties; and two days later, it entered into the contract with the Transport Company to effectuate such purpose. The provisions of this purchase contract, insofar as here material, are as follows. "Section 2. * * * "The base purchase price [of $10,000,000] to be paid by the Purchaser to the Seller at the closing shall be as follows: "(a) $4,000,000 in cash; "(b) $3,000,000 principal amount of the Purchaser's 5% Secured Promissory Notes, secured by a second mortgage covering the Purchaser's bondable transportation property, * * *; and "(c) 30,000 shares of the Purchaser's 5% Cumulative Preferred Stock, fully paid and non-assessable, having a par value of $100 per share, * * *. * * *
"The Seller represents that it has no present intention of disposing of the 5% Secured Promissory Notes and the 5% Cumulative Preferred Stock of the Purchaser to be received by it under this Agreement, *38 except to an associate company in the same holding company system, which will in turn acquire such securities with a view to holding them as an investment and not with a view to distribution. "Section 3. The purchaser agrees that prior to the closing it will issue and sell for cash at not less than the par or stated value thereof, Common Stock having a total par or stated value of at least Five-Hundred Thousand Dollars ($500,000). * * *
"Section 6. * * * "(b) The obligation of the Seller hereunder to convey the property to be sold hereunder is subject to the following conditions precedent: "1. That * * * counsel for the Purchaser shall have given an opinion to the Seller * * * that the 30,000 shares of 5% Cumulative Preferred Stock of the Purchaser to be delivered to the Seller * * * are validly issued, fully paid and nonassessable. * * *
"Section 7. This agreement is made subject to obtaining all consents, authorizations and orders which shall be required by law to be obtained from any regulatory authority in order to carry out the terms of this Agreement, which each of the parties hereto agrees forthwith to apply for and to prosecute with due diligence; * * *." Section 184.05(4) of the Wisconsin Statutes *39 of 1951 (here applicable) provided in part as follows: " § 184.05(4) - Classes Proportionate. The amount of securities of each class which any public service corporation may issue shall bear a reasonable proportion to each other and to the value of the property, * * *" Pursuant to the above-mentioned section 7 of the contract of purchase and the foregoing statutory provision, petitioner filed an application with the Wisconsin Public Service Commission for authority to issue the first mortgage bonds, the secured promissory notes, the preferred stock, and the common stock. Hearings were held; and the P.S.C., after finding that the issuance of the securities proposed to be issued complied with the relevant provisions of the Wisconsin Statutes and that the purchasers of said securities were afforded reasonable protection, certified on December 15, 1952, that petitioner was authorized to issue the securities, as requested. In a statement accompanying the P.S.C.'s findings of fact and certificate, the Commission said: "[Effectuation of petitioner's proposed financing plan] will result in a capital structure and a ratio of each class of security to the total capitalization as follows: Amount
Ratio
"First mortgage bonds
$ 4,000,000
38.1%
Second mortgage notes
3,000,000
28.6
"Total debt securities
$ 7,000,000
66.7
Preferred stock
3,000,000
28.6
Common stock
500,000
4.7
"Total capital structure
$10,500,000
100.0%
"As *40 indicated above, the proposed capital structure of the Suburban Company [the petitioner in the instant case] contains a disproportionate amount of securities senior to common stock. However, the secured promissory notes and preferred stock of the Suburban Company will not be in the hands of outside interests but will be owned initially by the Transport Company, which proposes to transfer the securities to the parent Electric Company. The application states that these securities will be held as an investment and not with a view to selling or distributing such securities. "In these circumstances it is concluded that the reasonable ratio provision of the statute does not bar the issuance of the securities as proposed. Further, in order to assure that an untimely distribution of the notes and preferred stock to the public is not made, the certificate herein will provide that the notes and preferred stock shall not be issued until the Suburban Company shall have obtained and filed with the Commission a written statement of the Electric Company agreeing not to sell or otherwise dispose of the notes or preferred stock (except through operation of the sinking fund) unless the authorization *41 of the Commission to such sale or distribution shall have been obtained. * * *" During the pendency of petitioner's application before the P.S.C., the Transport Company's vice president, who also was an officer of the parent Power Company, transmitted to said Commission a forecast of petitioner's net income for the years 1953 through 1963. In such forecast which reflected the view of the seller, interest obligations on the first mortgage bonds and second mortgage notes were shown as deductions from gross income to arrive at net income; but dividends on the preferred stock were not so shown. Also, petitioner (the buyer) caused to be prepared and filed as an exhibit at said hearings, an estimate of its available cash for each of the years 1953 through 1959. In a supporting schedule attached to such estimate, the interest on the first mortgage bonds and second mortgage notes was deducted from operating income to arrive at net income before taxes; but the dividends on the preferred stock were deducted only after an amount representing net income after taxes had been computed. At such hearings and at all other times during the pendency of petitioner's application before the P.S.C., petitioner's *42 representatives consistently referred to the preferred stock by that name; and at no time did they represent that such security evidenced a debt, or that it was anything other than preferred stock. Shortly after the execution of the above-mentioned purchase contract, the Transport Company and the parent Power Company filed a joint "application-declaration" with the United States Securities and Exchange Commission, wherein they sought to have the S.E.C. approve the proposed sale of the Transport Company's public passenger transportation properties to petitioner. A hearing was held, at which an attorney representing petitioner entered an appearance and at which petitioner also produced a witness to testify regarding the proposed sale. Petitioner's witness did not represent the preferred stock to be evidence of a debt, or as anything other than preferred stock. On December 24, 1952, the S.E.C. issued its findings and opinion and entered its order in the matter of the above-mentioned joint application-declaration, approving the proposed sale to petitioner. The Commission treated the proposed transaction as a plan for the simplification of the Power Company's holding company system; and *43 it approved the sale, as being necessary to accomplish the divestiture required by the statute, and as being fair and equitable to the parent Power Company's security holders. In such findings and opinion, the Commission stated in part: "We earlier noted that part of the consideration which Transport is to receive will consist of $3,000,000 of 5% Promissory Notes and $3,000,000 par value of 5% Cumulative Preferred Stock of New Transit Company [petitioner in the instant case]. As indicated previously, the securities to be issued by this company, and the terms thereof, are designed so as to bring about a gradual and relatively rapid retirement of the senior securities. Thus, the notes and preferred stock which Transport is to acquire are in no sense permanent investments such as would be precluded under the standards of Section 10 of the Act. * * *
"In appraising the effects of the proposed transactions, we have noted that the security structure of New Transit Company will include a rather large proportion of senior securities and, accordingly, the investment quality of the notes and preferred stock to be received by Transport will not, initially, be as good as might be desired. However, *44 the record before us indicates that New Transit Company should be able to make substantial reductions from year to year in the amount of senior securities outstanding. This, in turn, should result in a steady and material improvement in the quality of the notes and preferred stock to be held by Transport. "In reaching our conclusion that the acquisition of the notes and preferred stock can be permitted under the standards of Section 10 of the Act, we point out that these securities are of such nature as would cause us to hesitate to approve their acquisition under ordinary circumstances. However, we are aware that such acquisition is desirable in the situation here present to enable Transport, as required by Section 11(b), to dispose of its passenger transportation business; but our approval of the acquisition of these securities is not intended as a finding that they can be retained indefinitely in the WEPCO [the parent Power Company] system under the standards of Section 11(b). Under the circumstances, we need not make any adverse findings * * *." As above stated, petitioner's original capitalization at the time of its organization in October 1952, consisted of 10 shares of common *45 capital stock, having a par value of $100 per share. On December 19, 1952, petitioner amended its articles of incorporation to increase its capitalization to $3,500,000 in anticipation of carrying out the proposed purchase of the public passenger transportation properties. Article III(a) of the amended articles of incorporation provides as follows: "(a) The capital stock of the corporation shall consist of 30,000 shares of Cumulative Preferred Stock of the par value of $100 each (hereinafter called 'Preferred Stock') and 500,000 shares of Common Stock of the par value of $1.00 each (hereinafter called 'Common Stock')." On December 30, 1952, the proposed transaction was consummated, and petitioner purchased the public passenger transportation properties of the Transport Company. In connection therewith, petitioner issued 30,000 shares of $100 par value preferred stock to the Transport Company, as part of the agreed purchase price of $10,000,000. Such stock was designated on the certificate as "5% Cumulative Preferred Stock." The certificate for such preferred stock contained on the back thereof, the following material provisions: "(B) The holders of the preferred stock shall be entitled *46 to receive, when and as declared by the board of directors, out of surplus or net profits, cumulative dividends in cash at the rate of 5% per annum and no more, payable quarter-yearly * * *. Such dividends on the preferred stock shall be cumulative from and after the 30th day of December, 1952. "(C) The corporation, at the option of the board of directors, may redeem the preferred stock at the time outstanding, in whole at any time or in part from time to time, upon notice duly given as hereinafter specified, by paying therefor in cash the par value thereof, together with a sum equal to 5% per annum on the par value thereof from the 30th day of December, 1952 to the date fixed for redemption, less the aggregate amount of all dividends theretofore paid thereon. * * * "(D) So long as any shares of the preferred stock remain outstanding, there shall be set aside [annually] as a sinking fund for the retirement of preferred stock, [beginning on a date 15 months after the first mortgage bonds and second mortgage notes had been retired] * * *, "(1) An amount in cash sufficient to redeem at the redemption price hereinabove provided 3,000 shares of preferred stock; and "(2) An amount in cash *47 sufficient to redeem an aggregate par value of shares of preferred stock (to the nearest full share) equal to one-half of the net income of the corporation for the above twelve months' period, determined as hereinafter provided. * * *
"For the purposes of this paragraph (D) the term 'net income' shall mean [operating revenues, less operating expenses and dividends on preferred stock, and plus or minus nonoperating income or nonoperating loss] * * *. "(E) In case of liquidation, dissolution or winding up of the corporation * * *, the holders of preferred stock shall be entitled to receive the par value thereof in the distribution of corporation assets, other than profits, before any such assets shall be paid or distributed to holders of common stock, and to receive out of the earned surplus or net profits, or other legal sources then permitted for the payment of such dividends all accumulated and unpaid dividends before any payment is made or distributed out of such surplus, net profits or other legal sources to the holders of common stock. "(F) [In substance, petitioner was forbidden to merge, consolidate, or sell or lease substantially all its assets without the consent of the holders *48 of two-thirds of the outstanding preferred stock.] "(G) [In substance and so far as here material, so long as any of the preferred stock was outstanding, petitioner was limited in the amount of indebtedness which it could incur, to: (1) Short-term borrowings of $500,000; (2) the $4,000,000 of first mortgage bonds; (3) the $3,000,000 of secured promissory notes; and (4) long-term borrowings of $1,500,000, until $2,000,000 of the first mortgage bonds had been retired, and $2,500,000 of such borrowings thereafter.] "(H) Except as otherwise provided by statute or by subdivisions (F), (G) and (I) hereof, voting rights for all purposes shall be vested exclusively in the holders of the common stock, * * *. "(I) [In substance and so far as here material, the holders of the preferred stock were accorded the 'special right' of electing the smallest number of directors required to constitute a majority of petitioner's board of directors: (1) If and when dividends on the preferred stock were in default for eight quarters; or (2) if the petitioner corporation should have defaulted in setting aside the amounts for the sinking fund, as required in paragraph (D). The foregoing 'special right' of *49 the holders of the preferred stock was to be divested, and the term of the directors elected thereunder terminated, as soon as the default was cured.] "(J) [In substance and so far as here material, petitioner was forbidden, so long as any of the preferred stock was outstanding, to declare and pay cash dividends on its common stock, unless all dividends due at that time on the preferred stock had been paid, and unless there had been set aside the amounts required for the sinking fund.] "(K) [In substance, the holders of the preferred stock were not entitled to preemptive rights, with respect to any new or additional securities which petitioner might issue.]" Petitioner's attorneys advised the Transport Company in a letter dated December 30, 1952, in part as follows: "6. The 30,000 shares of Preferred Stock, a temporary certificate for which has been delivered to you today, are validly issued, fully paid and non-assessable. * * *" The preferred stock was entered on petitioner's books of account, in account number 2302, entitled "Preferred Capital Stock." In published annual reports to its stockholders, petitioner described such stock as 5 per cent cumulative preferred stock. The management *50 of the Transport Company believed that it was getting preferred stock having redemptive provisions. For each of the years 1953 and 1954, petitioner paid to the holders of its preferred stock $150,000 as "dividends" on the same. The Transport Company, in the course of the negotiations with the organizers of petitioner, had considered that payments to be received in respect of such preferred stock would be dividends, and that it would be entitled on its Federal income tax returns, to an 85 per cent dividends received credit or deduction, with respect to the same. On its returns for the years 1953 and 1954, dividends received credits or deductions were claimed. Petitioner, on its Federal income tax returns for each of the years 1953 and 1954, deducted as "interest" the amount of its payments with respect to the preferred stock. But respondent, in his statutory notices of deficiency, disallowed said claimed deductions. Petitioner, in computing on its 1953 return its excess profits credit based on invested capital, included the $3,000,000 of preferred stock in its borrowed capital (as distinguished from equity invested capital); and only 75 per cent of such amount was taken into account *51 in computing its excess profits credit. This action did not effect any change in the amount of petitioner's excess profits tax liability. OPINION (Issue I) When the parties came to selecting the type of security which was to supplement the first mortgage bonds and the second mortgage notes and the common stock, they found themselves impaled on the horns of a dilemma. Their task was to find a type of security which would sufficiently resemble debt to satisfy the S.E.C. that the Transport Company had divested itself of its passenger transportation properties; and, on the other hand, to satisfy the P.S.C. that the security represented an equity investment, in order to obtain the latter's approval of the issuance of such security. Presumably, petitioner wanted in terest deductions for the periodic payments which it was to make, and has made, with respect to this security; while, on the other hand, the Transport Company wanted the payments which it was to receive, to qualify as dividend payments, so that it might be entitled to dividends received credits or deductions with respect thereto. The result, as might well have been expected, was the creation of a hybrid, which is neither a pure *52 debt security nor a pure equity security, but which has some of the characteristics of each. Our task, in deciding the present issue (whether, despite the label of "dividends," the payments were in substance "interest on indebtedness"), is to put this security in either a debt category or an equity category. The present issue is by no means one of first impression. Some of the criteria which have been developed by the courts to aid in the difficult task of pigeonholing these hybrids, are: What name did the parties give to the instrument? Does the instrument have a definite maturity date? What is the source from which the "dividends" or "interest," as well as the redemption payments, will be paid? Does a holder of such security have a right to participate in the management of the issuing corporation? What rights does a holder have in the event of default in payment by the issuer? Does a holder have preference on liquidation over general creditors? What was the original intention of the issuer and the recipient of the security, as evidenced by all the surrounding facts and circumstances? Would classification of the security as an evidence of debt, produce a disproportionate amount of *53 debt in relation to equity capital? See Kingsmill Corporation, 28 T.C. 330; Mertens, Law of Federal Income Taxation, Vol. 4, §§ 26.10, 26.10a and 26.10c. Applying the foregoing criteria to the facts of the instant case, we have concluded that the security here involved represents an equity investment. Therefore, the payments made by petitioner with respect to the same are "dividends," which are not deductible for Federal tax purposes. The characteristics of the instrument which evidences the security involved, are predominantly those of an equity security. The instrument is plainly denominated, on its face, as preferred stock. It recites that the holder may become entitled to receive "cumulative dividends," but only when declared by petitioner's board of directors; and the source of such payments, so the instrument provides, shall be "surplus or net profits." The holder has preference on liquidation, dissolution, or a winding up of the petitioner, over the common stockholders, but not over general creditors. On failure of petitioner to pay dividends for eight consecutive quarters, or on its failure to set aside amounts for the sinking fund, the holder's sole remedy is to take over *54 direction of the corporation (by electing a sufficient number of directors to constitute a majority of the board of directors) until the default is cured. It it true that the provisions for a sinking fund do point to an intention on petitioner's part to repay the par value of the preferred stock, without regard to the existence of profits; but it should be observed that the obligation to set aside any amount for the sinking fund arises only after the first mortgage bonds and the second mortgage notes are paid off. Thus, there is neither a fixed obligation to pay the par value of the preferred stock, nor a fixed and definite maturity date. And, even if it were possible to construe the provisions of the preferred stock certificate as providing a fixed maturity date, that would not be conclusive as to the existence of a debtor-creditor relationship. Lee Telephone Co. v. Commissioner, (C.A. 4) 260 F. 2d 114, affirming T.C. Memo. 1957-230 [16 TCM 1044]; Commissioner v. Meridian & Thirteenth R. Co., (C.A. 7) 132 F. 2d 182. After considering all the foregoing, we think that the security itself points more toward an equity than toward a debt. Furthermore, the circumstances leading up to *55 and surrounding the creation and issuance of the security involved, impel us to the same conclusion - that the security represents an equity investment. In the initial negotiations, the principal negotiator on behalf of the Transport Company made it clear to the persons who were to organize the petitioner, that the security involved would have to qualify as an equity security, if the requisite approval by the P.S.C. was to be had; and said persons agreed. This same chief negotiator testified in the instant case, that his company had always intended to receive preferred stock. And said company, consistent with its belief that it did get preferred stock, has always regarded the payments which it received, to be dividends; and it has, for Federal tax purposes, uniformly availed itself of the dividends received credit or deduction, with respect thereto. Also, at the hearings before the P.S.C. and the S.E.C., the security was represented to be preferred stock, and nothing else. And documentary evidence submitted to each of these public bodies, both by petitioner and by the Transport Company, indicated that the payments with respect to the security were to be dividends. Thereafter, petitioner *56 amended its articles of incorporation, and therein provided that the security here in dispute was to be preferred stock. And its counsel, as required by the terms of the purchase contract, then advised the Transport Company that it was being issued preferred stock. Petitioner has at all times carried the security on its books, in an account entitled "Preferred Capital Stock." It also has so described the security in reports to its shareholders. Although petitioner in the excess profits schedule of its 1953 return, characterized the security as borrowed rather than invested capital, this can not be given too much weight because, even in the absence of such characterization, petitioner would have had no excess profits tax liability for that year. Moreover, the P.S.C., which approved the issuance of the securities, made findings of fact and issued a certificate of approval, in which (as shown in our Findings of Fact) it listed the first mortgage bonds and the second mortgage notes as debt securities, but did not so list the preferred stock. Also, it recited therein that the petitioner's application had represented that the preferred stock "will be held as an investment"; and stated that *57 its certificate of approval would not be issued, until the parent Power Company had given assurance that the preferred stock would not be disposed of without prior approval of the Commission. Also as regards the S.E.C., a reading of its findings and opinion convinces us that said Commission recognized that, despite the divestiture requirement of the Federal statute, the Transport Company retained through the preferred stock, an investment in petitioner. It is apparent that this Commission would rather have had a more complete severance on the part of the Transport Company; but it appears to have recognized that the transaction which it approved, was as complete a divestiture as could be expected in the circumstances. Finally, it should be observed that, if the preferred stock were classed as evidence of a debt, petitioner would have a capital structure made up of 95.3 per cent debt and only 4.7 per cent equity, or a ratio of debt to equity of 20 to 1. On the other hand, if the preferred stock is classed as equity capital, the ratio of debt to equity is the much more realistic one of 2 to 1. Considering the magnitude of the mass public transportation business in the City of Milwaukee, *58 it seems unrealistic to expect that petitioner could acquire and operate such a business with only $500,000 of equity capital. For all of the foregoing reasons, we sustain the respondent's determination as to this issue. Compare Lee Telephone Co. v. Commissioner, supra; Commissioner v. Meridian & Thirteenth R. Co., supra; Kingsmill Corporation, supra. Such action makes it unnecessary for us to consider the incidental questions, relating to the deductibility of the expense of issuing the security involved, and relating to the claimed net operating loss carryover deduction which is based on the deductibility both of said expense and of the payments made on such security. Petitioner appears to have recognized in its pleadings (and we agree) that the deductibility of these incidental items is dependent upon a determination that the preferred stock represents an indebtedness. And having held that such stock represents an equity investment rather than an indebtedness, we approve the respondent's disallowance of the deductions for said items. II. Issue re Accruability of Estimated Liability for Property Damages and Personal Injuries Findings of Fact During each of the taxable years 1953 *59 and 1954, petitioner operated approximately 1,000 vehicles, including street cars, trolley buses, and gasoline and diesel buses. It carried approximately 281 million passengers in 1953, and 250 million passengers in 1954; and in each of these years, petitioner's passenger vehicles were operated in excess of 33 million miles. In 1953, petitioner's operating vehicles were involved in 5,903 accidents; and in 1954 the number of accidents was 5,041. During each of the taxable years, petitioner carried what is called "excess public liability insurance," to cover the operation of its motor buses and other vehicles, under policies which insured against liability of petitioner for property damages and personal injuries occasioned by any one accident, to the extent that such liability should exceed $100,000 but be less than $1,000,000. This was petitioner's only liability insurance coverage. As to liability for property damages and personal injuries in amounts less than $100,000, petitioner sought from the Motor Vehicle Department of the State of Wisconsin, and was granted, the right to act as a self-insurer. Petitioner maintained a staff of attorneys and claim adjusters to investigate accidents *60 occurring in the course of the operation of its vehicles, to effect settlements, and to defend petitioner in suits brought by parties injured or damaged in such accidents. As a result of investigations made by the attorneys and claim adjusters, settlement of the great majority of the accident claims made against petitioner was effected during the same year that the accidents occurred. As of December 31, 1953, there were 414 claims unsettled. And as of December 31, 1954, there were 447 unsettled claims growing out of accidents occurring in such year. Also, some of the claims unsettled as at December 31, 1953, remained unsettled at the end of the year 1954. At the end of each of the years 1953 and 1954, petitioner's board of directors appointed from their number, a committee of three (two of whom were attorneys) to examine the information gathered by petitioner's attorneys and claim adjusters relating to each of the unsettled claims, and to determine whether in such committee's opinion petitioner was liable, and to what extent. The committee members were assisted in their work for both taxable years, by the petitioner's general claim agent; and in the first of such years they were assisted *61 also by a certified public accountant from the firm which audited petitioner's books of account. In January 1954, the committee made a report to the board of directors of its findings with respect to the unsettled claims pending as of December 31, 1953. The committee estimated that petitioner's liability with respect to the 414 pending claims for that year was $254,659; and the committee authorized the general claim agent to dispose of these several claims at the amounts at which they had been appraised. Petitioner's board of directors ratified and confirmed its committee's action. Also, the committee made a similar report in January 1955, relating to the unsettled claims arising out of 1954 accidents, estimated petitioner's liability with respect to the 447 pending claims for said year to be $161,136.50; and authorized the general claim agent to dispose of such pending claims at the amounts at which they had been appraised. The committee's action with respect to unsettled claims of the year 1954 was likewise ratified and confirmed by the board of directors. Petitioner did not at any time notify, or otherwise admit to, any of the claimants that it considered itself liable; nor did *62 it make an offer to any claimant to settle his claim at the amount at which such claim had been appraised. It always sought to settle claims at the lowest possible figure. As of December 31, 1953, petitioner set up on its books of account, as a book liability for unsettled claims, the above-mentioned amount of $254,659; and it also debited a related expense account for injuries and damages, in the same amount. On its Federal income tax return for the year 1953, petitioner claimed a deduction for said amount of $254,659. As regards the taxable year 1954, petitioner, as of December 31, 1954, increased its aforesaid liability account by the amount of $142,022.87, and debited its related expense account for the same amount. On its 1954 income tax return, it claimed a deduction for said amount of $142,022.87, which was computed as follows: Appraised liability on unsettled
claims, 1954 accidents
$161,136.50
Deduct: Appraised liabil-
ity of 1953 claims settled
in 1954
$94,984.00
Less: Amounts at which
1953 claims were ac-
tually settled
75,870.37
19,113.63
Net amount expensed and added to
liability account
$142,022.87
The respondent, in his statutory notices of deficiency, disallowed the entire amount of *63 $254,659, which was claimed as a deduction on petitioner's 1953 return; and he also disallowed $61,472.79 of the $142,022.87 which was claimed as a deduction on petitioner's 1954 return. [2] The respondent allowed as a deduction in each taxable year, the amount of the claims for injuries and damages which actually were settled by the petitioner in each such year. The claims in 22 of the 414 unsettled claims for the year 1953 began suit against petitioner on or before December 31 of said year; and during 1954, claimants in 16 of the 447 claims unsettled as of December 31 of said year began suit against petitioner. Of the 22 claims for the year 1953 which were in litigation at the end of said year, 3 of the same were still in litigation at August 31, 1958; and of the 16 claims on which litigation had been begun during the year 1954 (and which were still in litigation at the *64 end of said year), 9 of the same were still in litigation at August 31, 1958. With respect to each of the claims which was in litigation at the end of each of the years 1953 and 1954, petitioner denied liability in its pleadings for such cases. In addition to the claims in litigation above mentioned, other unsettled claims arising out of accidents which had occurred in each of the taxable years were put into litigation after the close of each such year. Suit was thus begun on 31 of the claims pending at December 31, 1953, and on 32 of the claims pending at December 31, 1954. All claims on which litigation was begun after the close of the taxable years were settled on or before August 31, 1958. Many potential claims with respect to which the committee of petitioner's board of directors determined that petitioner was liable and with respect to which estimates of the amounts of liability were made, never progressed beyond the point of reports made to petitioner by its employees; for the injured parties neither presented claims to petitioner nor filed suit against it. There were 138 and 144 of such situations, involving estimated liabilities of $34,470 and $26,521, for the taxable years *65 1953 and 1954, respectively. The statute of limitations had run against any suit for the same by the time of the trial of the present case; and petitioner will not have to make any payment with respect thereto. All claims pending at the end of each taxable year (other than those litigated and those not pressed by the injured parties) were settled after the close of such years, without the necessity for resort to litigation. The committee of petitioner's board of directors determined the petitioner had no liability in respect of 15 of the unsettled claims pending at December 31, 1953, and in respect of 49 of the unsettled claims pending at December 31, 1954. But nevertheless, petitioner ultimately made settlements, whereunder it paid sums of money to the claimants in 14 of such 1953 claims and in 43 of such 1954 claims. As regards claims wherein the committee had estimated that petitioner was liable and settlements were made (either with or without litigation), the settlement amounts were equal to the estimates in only 31 out of 261 of such 1953 claims, and in only 22 out of 254 of such 1954 claims. Settlements were at variance with estimates by more than 100 per cent in 97 of said *66 1953 claims and in 102 of said 1954 claims. As regards claims which were still unsettled at the time of the trial herein, only those listed in the following table were then regarded by the petitioner to be still open; and the amounts shown opposite each of such claims represent petitioner's original estimates, and its current estimates at the time of the trial herein, of its liability with respect to the same: Year 1953
Claim
Original
Current
Number
Estimate
Estimate
4
$ 150
$ 400
23
100
1,500
71
100
1,500
99
1,700
800
101
500
3,500
168
750
3,500
212
400
2,500
263
1,500
800
$ 5,200
$14,500
Year 1954
416
$ 300
$ 1,500
419
3,500
2,000
442
2,000
7,000
467
750
2,000
474
350
3,000
506
300
3,500
513
1,000
10,000
525
1,500
15,000
554
200
150
558
750
1,500
589
500
2,500
639
1,000
2,500
679
600
765
$12,750
$51,415 The differences between the above current estimates and the above original estimates were, in all instances, due to circumstances which could not have been foreseen at the time when the original estimates were made. The following table shows a comparison of petitioner's estimates of its total liability for unsettled claims at the end of each of the taxable years, with the total amounts actually paid out in settlements thereof: Peti-
Payments Actually
Number
tioner's
Made in Settlement
of
Estimated
of Same, Through
Year
Claims
Liability
August 31, 1958
1953
414
$254,659.00 * *67 $178,230.24
1954
447
161,136.50 **
159,851.84
OPINION (Issue II) The question here presented is whether petitioner, an accrual basis taxpayer, may deduct for each of the years 1953 and 1954, certain amounts accrued by it on its books of account as of December 31 of each year. Such amounts represented its estimate of the probable amounts which it would have to pay in settlement for personal injuries and property damages, arising out of accidents in which its employees and equipment were involved. As hereinbefore shown in our Findings of Fact, equipment operated by petitioner's employees was involved in more than 5,000 accidents in each of the taxable years; and the bulk of the claims for damages arising out of these accidents in a particular year were settled during the course of such year. However, at the end of each taxable year, there were approximately 400 claims still pending, some of which were in litigation, and as to all of which petitioner denied liability. A committee, appointed by petitioner's board of directors and assisted by its general claim agent and an accountant, currently examined the available data with respect *68 to such unsettled claims; and they then determined whether in their opinion petitioner was liable therefor, and to what extent. The general claim agent was authorized by the committee to settle each of the pending claims for the amount at which it was appraised; and the committee's action was thereafter ratified and approved by the petitioner's board of directors. For the taxable year 1953, petitioner set up on its books as an accrued liability and as a related accrued expense, the total amount estimated by the committee to be petitioner's liability for unsettled claims. And for 1954, it similarly set up on its books amounts which (as shown in our Findings of Fact) were somewhat less than the committee's estimates. We must here decide whether the amount so accrued as an expense for each year constitutes an allowable deduction for Federal income tax purposes. It is a well settled principle of law, that two conditions must be fulfilled before an expense becomes accruable and deductible for Federal income tax purposes: (1) During the taxable year all events must have occurred which establish in the taxpayer a definite liability to pay such expense; and (2) the amount of such liability *69 must be determinable within the taxable year, with reasonable certainty. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516; Anderson v. United States, 269 U.S. 422; Uncasville Mfg. Co. v. Commissioner, 55 F. 2d 893; Ralph L. Patsch, 19 T.C. 189, 195, affd. (C.A. 3) 208 F. 2d 532. Where the taxpayer is contesting his liability, no accrual may be made for tax purposes until the contest ends. Dixie Pine Products Co. v. Commissioner, supra; Security Flour Mills Co. v. Commissioner, 321 U.S. 281; Denver & Rio Grande Western Railroad Co., 32 T.C. 43. Applying the foregoing legal standards to the facts of the instant case, it becomes apparent from the following that the amounts accrued by petitioner on its books as expenses for estimated liabilities, do not meet either of the above-mentioned conditions precedent to accrual. First, the existence of petitioner's liability respecting the unsettled claims of each year did not become definitely fixed during such year. Several of the claims were actually in litigation at the end of each year; and as to these, petitioner's pleadings in the lawsuits denied any liability. As to all remaining claims (many of which were put in litigation *70 after the close of the taxable years in which they arose), petitioner did not during such years admit its liability to any claimant. And, though petitioner's general claim agent was vested with authority to settle the pending claims at the amounts estimated by its board's committee, said agent testified that petitioner did not make any offer to settle the claims at the appraised figures, but contrariwise sought to settle each claim at the lowest possible figure. We conclude that petitioner's liability as to each unsettled claim was contested; and that there was not within either of the taxable years, any definitely fixed liability to pay any unsettled claim pending as of the end of such year. Secondly, the amount of petitioner's liability in respect of unsettled claims of each year was not ascertainable within such year, with reasonable certainty. Only 31 of the 261 claims for 1953, with respect to which estimates of liability had been made and with respect to which settlements were ultimately effected, were settled by petitioner for amounts equal to the estimates of liability; and for the year 1954, only 22 of the 254 such claims were ultimately settled for amounts which tallied with *71 the estimates. As regards those claims for which petitioner estimated that it was liable, the settlements were at variance with the estimates by more than 100 per cent, in 97 of the claims for 1953 and in 102 of the claims for 1954. Many other settlements in each year varied more than 50 per cent from the estimates of liability. In respect of numerous unsettled claims of each year, petitioner estimated that it had no liability; but in the overwhelming majority of these cases, it did make monetary settlements with the claimants. Also, many of the so-called claims were only potential claims which never were pressed by the injured parties, and as to which petitioner has not made and will not make any payment. Furthermore, as to the unsettled claims which petitioner considered to be still open at the time of the trial herein, the table in our Findings of Fact shows that petitioner's current estimates of its liability are, in most instances, widely at variance with its original estimates; and petitioner's general claim agent testified that this was due to unforeseeable conditions arising after the original estimates had been made. In the light of all the foregoing, it is manifest that petitioner *72 could not estimate the bulk of its potential liabilities with even approximate, not to say reasonable, certainty. In substance what petitioner is here attempting to do, is to take deductions for amounts used to create, and to supplement, a reserve for contingent liabilities in respect of unsettled and potential claims for property damage and personal injury. But, as we said in deciding the seventh issue in the recent case of Denver & Rio Grande Western Railroad Co., supra: "[A] reserve for contingent liabilities of this kind [contingent liabilities almost identical with those here involved] has never been allowed under any of the Revenue Acts or Internal Revenue Codes. Lucas v. American Code Co., 280 U.S. 445; Richmond Light & Railroad Co., supra [4 B.T.A. 91; Ralph L. Patsch, 19 T.C. 189, affd. 208 F. 2d 532. Also, even in the very early case of William J. Ostheimer, 1 B.T.A. 18, we said: "While it might have been sound business practice on the part of the taxpayer to set up a reserve out of his income to meet a future liability, such a reserve is not deductible in determining net income." Petitioner has, however, vigorously pressed upon us the argument that, while considered *73 individually the unsettled claims were contested and unsusceptible of accurate determination; yet, if the unsettled claims of each year are viewed in the aggregate, it can be taken as certain that petitioner will have some liability and that estimates of its total net liability with respect to the aggregate of each year's unsettled claims can be determined. It cites in this connection, two cases: Ocean Accident & Guarantee Corporation, Ltd. v. Commissioner, (C.A. 2) 47 F. 2d 582, reversing 13 B.T.A. 1057 and 16 B.T.A. 1313; and Pacific Employers Insurance Co., 33 B.T.A. 501. In each of these cases the taxpayer was an insurance company, and it was allowed to deduct accrued estimates of its unpaid liabilities. But, the answers to petitioner's argument, and also the distinction between the cited cases and the instant case, are provided by the following quotation from the Supreme Court's opinion in Brown v. Helvering, 291 U.S. 193, wherein the court said: "The liability of Edward Brown & Sons [a general agent for insurance companies] arising from expected future cancellations was not deductible from gross income because it was not fixed and absolute. In respect to no particular policy *74 written within the year could it be known that it would be canceled in a future year. Nor could it be known that a definite percentage of all the policies will be canceled in the future years. Experience taught that there is a strong probability that many of the policies written during the taxable year will be so canceled. But experience taught also that we are not dealing here with certainties. This is shown by the variations in the percentages in the several five-year periods of the aggregate of refunds to the aggregate of overriding commissions. "Brown argues that, since insurance companies are allowed to deduct reserves for unearned premiums which may have to be refunded, he should be allowed to make the deductions claimed as being similar in character. The simple answer is that the general agent is not an insurance company; and that the deductions allowed for additions to the reserves of insurance companies are technical in character and are specifically provided for in the Revenue Acts. These technical reserves are required to be made by the insurance laws of the several states. * * *" The respondent apparently has allowed to petitioner those portions of its claimed deductions *75 for the liabilities here involved which represent the amounts of the settlements actually made in each of the taxable years, in respect of such liabilities. We think that the allowance of only such amounts produces a more clear reflection of income than would the allowance of the exceedingly rough estimates made by petitioner of its liabilities for potential and unsettled claims. On the basis of the authorities above cited, we hold that the amounts allowed by respondent are the maximum amounts to which petitioner is entitled; and we approve the respondent's determinations as to the present issue. Decisions will be entered for the respondent. Footnotes
2. The record does not contain the computation which the respondent used to arrive at the amount disallowed for 1954. From a computation suggested by the petitioner in its briefs, it appears that the disallowance represents the difference between the claimed deduction, and the amount of the 1953 claims settled in 1954.↩
*. Includes $34,470, representing 138 unpressed claims. **. Includes $26,521, representing 144 unpressed claims.↩